[Cite as *In re L.S.*, 2018-Ohio-4758.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
OTTAWA COUNTY

In re L.S., Jr.

Court of Appeals Nos. OT-17-021
OT-17-025

Trial Court No. 2016-JOA-304

**DECISION AND JUDGMENT**

Decided: November 30, 2018

* * * * *

Timothy Young, Ohio Public Defender, and Timothy B.
Hackett, Assistant State Public Defender, for appellant.

James J. VanEerten, Ottawa County Prosecuting Attorney, and
Barbara Gallé Rivas, Assistant Prosecuting Attorney, for appellee.

* * * * *

**MAYLE, P. J.**

{¶ 1} In this consolidated appeal, appellant, L.S., Jr. ("L.S."), appeals the

November 21, 2016 and June 1, 2017 judgments of the Ottawa County Court of Common

Pleas, Juvenile Division, adjudicating him delinquent and committing him to the legal

custody of the Ohio Department of Youth Services ("DYS"). For the following reasons, we affirm, in part, and reverse, in part.

## I. Background

{¶ 2} Sixteen-year-old L.S. was adjudicated delinquent in connection with the rape of his friend, 17-year-old R.J. According to the evidence presented at his delinquency hearing, on April 20, 2016, L.S. and R.J. went to a friend's house after school to smoke marijuana with other teens. R.J. was on probation for truancy, so she took only one hit. The group disbanded and made plans to meet later that night, and L.S. told R.J. that he would find someone to help him get a bottle of Southern Comfort since she could not smoke marijuana.

{¶ 3} Around 7:30 or 8:00 that night, L.S. and R.J. met up again at the home of R.J.'s boyfriend. As promised, L.S. brought a large bottle of Southern Comfort, and the teenagers started doing shots. R.J. estimated that she consumed two or three shots. They left her boyfriend's house and went over to her cousin's to continue drinking.

{¶ 4} At her cousin's, R.J. drank two glasses of Southern Comfort. She was stumbling and feeling woozy and at around 10:30 or 11:00 p.m., she began getting nervous about her probation-mandated curfew. L.S. walked her home around 11:15 p.m., and they continued to drink Southern Comfort out of a water bottle on the way home. As they walked, L.S. held on to R.J. to steady her. But L.S. was also reaching up R.J.'s shirt, trying to grab her breasts. R.J. told him to stop because she had a boyfriend, and L.S. tried to persuade R.J. to leave her boyfriend.

2.

{¶ 5} When they got to R.J.'s home, R.J. and L.S. rolled some cigarettes. R.J. described feeling very drunk by this time. The next thing she remembered was her mother putting her to bed beside her 16-year-old brother, J.A.

{¶ 6} R.J. awoke the next morning just after 7:00 a.m. L.S. was there and was preparing to leave, but they did not speak to each other. As the morning progressed, R.J. "[came] to the realization that something had happened" with L.S. during the night. She remembered L.S. being on top of her. He performed oral sex on her, then flipped her over and penetrated her anally. R.J. recalled telling him "no" two or three times and described that she was blacking in and out while this was happening. R.J. called L.S. on Facebook and told him not to tell anyone what had happened.

{¶ 7} R.J. continued to recall "bits and pieces" of what had happened the night before, and she "knew something bad had happened that [she] did not agree to." She went to her aunt's house crying. While there, R.J. took a shower. She noticed that her "butt" hurt. She told her aunt what had happened.

{¶ 8} R.J. and her aunt were unsure whether to report the incident. R.J. called her boyfriend's mother who encouraged R.J. to tell her probation officer. R.J. also talked to her mom. Her mother initially did not want her to report the incident. For one, R.J.'s mother "thought it was good" if something had happened with L.S. because she did not like R.J.'s boyfriend. In addition to that, she did not immediately believe R.J. She thought that R.J. had simply cheated on her boyfriend with L.S. and was afraid her

3.

boyfriend would find out. Despite her initial misgivings, R.J.'s mother eventually agreed that the incident needed to be reported.

{¶ 9} R.J. went to the Toledo Hospital where she underwent a sexual assault nurse examination ("SANE") and a rape kit was performed. The SANE nurse observed multiple small tears to R.J.'s anus. Her clothing and DNA samples were collected for testing.

{¶ 10} R.J. came to learn that she had been sexually assaulted by L.S. and by Jordan Carrisales, the 20-year-old son of a family friend who was staying at her home. Detective Corbin Carpenter of the Port Clinton Police Department interviewed both Carrisales and L.S.

{¶ 11} Carrisales said that he, L.S., R.J., and J.A. all slept in the same bed that night. According to Carrisales, R.J. was "really drunk," but L.S. "seemed all right." Carrisales said that he saw L.S. and R.J. having sex, and R.J. was awake. R.J. did not tell L.S. no, but she said, "I don't think I can do this." It did not appear to Carrisales that R.J. was being forced to have sex against her will. Carrisales also claimed that R.J. put her hand down his pants and "tried jacking [him] off," so Carrisales "ended up having sex with her" too.

{¶ 12} L.S., on the other hand, denied having sex with R.J. He said that Carrisales had sex with R.J. and R.J. tried to initiate sexual contact with L.S., but L.S. refused her and moved from the bed to the floor. L.S. provided a timeline of the evening that

4.

differed in some respects from R.J.'s timeline and omitted certain events. L.S. did, however, voluntarily provide a sample of his DNA.

{¶ 13} DNA analysis revealed the presence of L.S.'s semen in R.J.'s vagina and on the front and back panels of her underwear. Carrisales's semen was also identified on the front and back panels of R.J.'s underwear. Carrisales ultimately entered a plea of guilty to sexual battery in connection with this incident, conceding that it had been wrong for him to have had sex with R.J. in the state she was in.

{¶ 14} Complaints were filed against L.S. in the Ottawa County Common Pleas Court, Juvenile Division, on June 17, 2016, charging him with rape under R.C. 2907.02(A)(1)(c), rape under R.C. 2907.02(A)(2), and kidnapping under R.C. 2905.01(A)(4). The juvenile court adjudicated L.S. delinquent of one count of rape in violation of R.C. 2907.02(A)(1)(c), a felony of the first degree if committed by an adult, and dismissed the other two charges. It committed L.S. to the legal custody of DYS for a minimum period of one year and a maximum period not to exceed L.S.'s attainment of age 21. The court suspended the commitment subject to a number of conditions, including that L.S. undergo treatment at the Juvenile Residential Center of Northwest Ohio. The disposition was memorialized in a judgment entry filed on November 21, 2016.

{¶ 15} The trial court later granted a motion to impose the suspended DYS commitment after L.S. failed to undergo the required treatment. The court's decision was memorialized in a judgment entry journalized on June 8, 2017.

5.

**{¶ 16}** L.S. appealed and assigns the following errors for our review:

Assignment of Error I: The Ottawa County Juvenile Court violated L.S., Jr.'s right to due process of law, because its finding of delinquency lacked sufficient, credible, and reliable evidentiary support. Fifth and Fourteenth Amendments to the United States Constitution; Article I, Section 16 of the Ohio Constitution.

Assignment of Error II: L.S., Jr. was denied his right to due process of law when he was adjudicated delinquent, because R.C. 2907.02(A)(1)(c) is unconstitutionally vague and results in the arbitrary and discriminatory enforcement of the law. Fifth and Fourteenth Amendment[s] to the United States Constitution; Article I, Section 16 of the Ohio Constitution.

Assignment of Error III: The Ottawa County Juvenile Court Violated L.S., Jr.'s right to due process of law when it failed to follow the requirements of Juv.R. 29 and 35. Fifth and Fourteenth Amendments to the United States Constitution; Article I, Section 16, of the Ohio Constitution.

Assignment of Error IV: L.S., Jr. was denied his constitutional right to the effective assistance of counsel, in violation of the Sixth and Fourteenth Amendments to the United States Constitution; and, Article I, Section 16 of the Ohio Constitution.

6.

## II. Law and Analysis

### A. Sufficiency and Manifest Weight of the Evidence

{¶ 17} L.S. was convicted of rape under R.C. 2907.02(A)(1)(c), which prohibits a person from engaging in sexual conduct with another when "[t]he other person's ability to resist or consent is substantially impaired because of a mental or physical condition * * * and the offender knows or has reasonable cause to believe that the other person's ability to resist or consent is substantially impaired because of a mental or physical condition * * *." In his first assignment of error, L.S. argues that the trial court's adjudication of delinquency lacked sufficient evidence and was against the manifest weight of the evidence because the state failed to prove that R.J.'s ability to resist or consent was "substantially impaired," or that L.S. knew or should have known that R.J.'s ability to resist or consent was substantially impaired. While he concedes that R.J. was intoxicated, L.S. argues that the state did not prove beyond a reasonable doubt that her voluntary intoxication "crippled her ability to consent or resist."

{¶ 18} It is well-recognized by Ohio courts that voluntary intoxication can constitute a mental or physical condition that substantially impairs a person's ability to resist or consent to sexual conduct. *See In re J.J.*, 6th Dist. Erie No. E-11-018, 2012-Ohio-2550, ¶ 16 ("Voluntary intoxication is a mental or physical condition within the meaning of [R.C. 2907.02(A)(1)(c)]."); *State v. Harmath*, 3d Dist. Seneca No. 13-06-20, 2007-Ohio-2993, ¶ 14. While L.S. does not dispute this point, he argues that the state did not present sufficient evidence that R.J.'s voluntary intoxication rose to such a level here.

7.

L.S. also claims that the state failed to offer any evidence of his observations regarding R.J.'s ability to resist or consent, which he insists was particularly important given that he too had been drinking and smoking marijuana and was functioning at diminished capacity.

{¶ 19} Whether there is sufficient evidence to support a conviction is a question of law. *State v. Thompkins,* 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). In reviewing a challenge to the sufficiency of evidence, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." (Internal citations omitted.) *State v. Smith*, 80 Ohio St.3d 89, 113, 684 N.E.2d 668 (1997). In making that determination, the appellate court will not weigh the evidence or assess the credibility of the witnesses. *State v. Walker,* 55 Ohio St.2d 208, 212, 378 N.E.2d 1049 (1978).

{¶ 20} Substantial impairment can occur when a person consumes large amounts of alcohol in a short period of time. *State v. Lasenby*, 3d Dist. Allen No. 1-13-36, 2014-Ohio-1878, ¶ 28, citing *State v. Hatten*, 186 Ohio App.3d 286, 2010-Ohio-499, 927 N.E.2d 632, ¶ 22 (2d Dist.). "'[S]tumbling, falling, slurred speech, passing out, [and] vomiting,' are all evidence that an intoxicated person is substantially impaired." *Id.*, quoting *Hatten* at ¶ 24. A victim's inability to remember the events of the incident due to alcohol consumption can also constitute evidence of substantial impairment. *Id.*, citing *Harmath* at ¶ 19.

8.

{¶ 21} "[T]he determination of substantial impairment is made 'on a case-by-case basis, providing great deference to the fact-finder.'" *State v. Canterbury*, 4th Dist. Athens No. 13CA34, 2015-Ohio-1926, ¶ 58, quoting *Lasenby at* ¶ 27, citing *State v. Brown*, 3d Dist. Marion No. 9-09-15, 2009-Ohio-5428, ¶ 22. It may be shown by the testimony of people who interacted with the victim and by the trier of fact's assessment of the person's ability to control his or her conduct. *Canterbury* at ¶ 58.

{¶ 22} R.J. testified at L.S.'s delinquency hearing. She said that she rarely drinks alcohol, but on the night of this incident, she consumed two to three shots of Southern Comfort and two rocks glasses of the same liquor. She was sipping on a bottle of the alcohol as she walked home. She described that as she and L.S. walked to her house, she was stumbling to the point that L.S. needed to hold on to her. She said she felt "really, really drunk." Once home, her mother had to "put" her to bed. R.J. also explained that she blacked out "as soon as she got to [her] house." She said that while L.S. performed oral sex on her and penetrated her anally, she "was blacking in and out of it and I couldn't really understand what was going on." She described that she "couldn't really move. It was like flashbacks, in and out of it, black out."

{¶ 23} Carrisales and R.J.'s mother also testified. Carrisales described that R.J. could barely talk, had fallen over, and "got sick" outside. And R.J.'s mother testified that R.J. could not walk straight, she was falling down, and she fell out of a chair and had to be helped up by Carrisales and L.S.

9.

**{¶ 24}** We find that this testimony was sufficient evidence that R.J.'s ability to resist or consent to sexual conduct was substantially impaired.

**{¶ 25}** As for L.S.'s awareness of R.J.'s substantial impairment, it is clear that L.S. was also drinking alcohol and had smoked marijuana that day. But the state presented evidence that could support a finding that L.S. remained able to recognize that R.J. was intoxicated to the point that her ability to resist or consent was substantially impaired. For one, R.J.'s mother described that L.S. was coherent and did not show signs of being intoxicated. He was not stumbling, he did not slur his speech, his eyes were not glassy, and she was able to have a coherent conversation with him. Carrisales also described that L.S. "seemed all right." In addition to this, L.S. helped steady R.J. as she walked home, helped her when she fell out of the chair at her house, and assisted R.J.'s mother in putting her to bed, all of which suggest that L.S. remained capable of recognizing the extent of R.J.'s level of intoxication.

**{¶ 26}** We find that this testimony constituted sufficient evidence that L.S. knew or should have known that R.J.'s ability to resist or consent to sexual conduct was substantially impaired.

**{¶ 27}** We next turn to L.S.'s claim that the juvenile court's adjudication of delinquency was against the manifest weight of the evidence. When reviewing a claim that a verdict is against the manifest weight of the evidence, the appellate court must weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether the fact-finder clearly lost its way in resolving evidentiary

10.

conflicts so as to create such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Thompkins, 78 Ohio St.3d 380, 387, 678 N.E.2d 541*. We do not view the evidence in a light most favorable to the state. "Instead, we sit as a 'thirteenth juror' and scrutinize 'the factfinder's resolution of the conflicting testimony.'" *State v. Robinson,* 6th Dist. Lucas No. L-10-1369, 2012-Ohio-6068, ¶ 15, citing *Thompkins* at 388. Reversal on manifest weight grounds is reserved for "the exceptional case in which the evidence weighs heavily against the conviction." *Thompkins* at 387, quoting *State v. Martin, 20 Ohio App.3d 172,* 175, 485 N.E.2d 717 (1st Dist.1983).

{¶ 28} Although under a manifest-weight standard we consider the credibility of witnesses, we must nonetheless extend special deference to the fact-finder's credibility determinations given that it is the fact-finder who has the benefit of seeing the witnesses testify, observing their facial expressions and body language, hearing their voice inflections, and discerning qualities such as hesitancy, equivocation, and candor. *State v. Fell*, 6th Dist. Lucas No. L-10-1162, 2012-Ohio-616, ¶ 14. "[I]t is well-established that the juvenile court, as the trier of fact, [is] free to believe all, part or none of [the] witnesses' testimony." *State v. Z.G.B.*, 12th Dist. Warren No. CA2016-04-029, 2016-Ohio-7195, ¶ 17, citing *In re D.T.W.*, 12th Dist. Butler No. CA2014-09-198, 2015-Ohio-2317, ¶ 37.

{¶ 29} L.S. argues that because Carrisales was a participant to the incident and R.J. "couldn't really comprehend what was going on," ambiguities remained concerning who committed what conduct. He also points out that in the SANE records, it is noted

11.

that R.J. performed masturbation at some point that night, which he claims calls into question the nature and extent of R.J.'s participation.

{¶ 30} As to R.J. performing "masturbation," the SANE nurse clarified that R.J. told her that L.S. had "put her hand down there and tried to make her do things." What's more, the BCI analysis confirmed the presence of L.S.'s sperm in vaginal samples and in the front and back panels of R.J.'s underwear. We find that this evidence, combined with the testimony presented to the juvenile court, supports the court's conclusion that L.S. violated R.C. **2907.02(A)(1)(c).**

{¶ 31} Accordingly, we find that the trial court's adjudication of delinquency was not against the manifest weight of the evidence, and this is not the exceptional case requiring reversal.

{¶ 32} We find L.S.'s first assignment of error not well-taken.

### B. Constitutionality of R.C. 2907.02(A)(1)(c)

{¶ 33} In his second assignment of error, L.S. argues that he was denied his right to due process when he was adjudicated delinquent because R.C. 2907.02(A)(1)(c) is "unconstitutionally vague and results in the arbitrary and discriminatory enforcement of the law." He complains that there are no guidelines for the enforcement of this statute where the participants are two voluntarily-intoxicated teens, and he insists that under these circumstances, "both fit the definition of victim and both fit the definition of offender."

12.

**{¶ 34}** L.S. acknowledges that he failed to raise this issue at trial. "Constitutional issues apparent at the time of the trial are waived unless brought to the attention of the trial court." *In re J.J.*, 6th Dist. Erie No. E-11-018, 2012-Ohio-2550, ¶ 10. Our review of L.S.'s assignment of error is, therefore, limited to plain error. Plain error is error that affects substantial rights. Crim.R. 52(B). In determining whether plain error occurred, we must examine the alleged error in light of all of the evidence properly admitted at trial. *State v. Hill*, 92 Ohio St.3d 191, 203, 749 N.E.2d 274 (2001). Plain error should be found "only in exceptional circumstances and only to prevent a manifest miscarriage of justice." *Id.*, citing *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph three of the syllabus. "Reversal is warranted only if the outcome of the trial clearly would have been different absent the error." *Id.*, citing *Long* at paragraph two of the syllabus.

**{¶ 35}** As we explained in *In re J.J.*, when a statute is challenged under the due process doctrine of vagueness, a court must determine "whether the enactment (1) provides sufficient notice of its proscriptions and (2) contains reasonably clear guidelines to prevent official arbitrariness or discrimination in its enforcement." *Id.* at ¶ 15, quoting *Perez v. Cleveland*, 78 Ohio St.3d 376, 378, 678 N.E.2d 537 (1997), quoting *Smith v. Goguen*, 415 U.S. 566, 94 S.Ct. 1242, 39 L.Ed.2d 605 (1974).

**{¶ 36}** In arguing that R.C. 2907.02(A)(1)(c) is unconstitutionally vague as applied here, L.S. compares this subsection to subsection (A)(1)(b) of the statute, which

13.

the Ohio Supreme Court found unconstitutionally vague as applied in *In re D.B.*, 129 Ohio St.3d 104, 2011-Ohio-2671, 950 N.E.2d 528, ¶ 24.

{¶ 37} In *In re D.B.,* the juvenile was adjudicated delinquent for having violated R.C. 2907.02(A)(1)(b), which prohibits a person from engaging in sexual conduct with another when "[t]he other person is less than 13 years of age, whether or not the offender knows the age of the other person."  But both the offender and the victim were under 13 years old.  The Ohio Supreme Court found that "[a]s applied to children under the age of 13 who engage in sexual conduct with other children under the age of 13, R.C. 2907.02(A)(1)(b) is unconstitutionally vague because the statute authorizes and encourages arbitrary and discriminatory enforcement."  *Id.* at ¶ 24.  It explained that "[w]hen an adult engages in sexual conduct with a child under the age of 13, it is clear which party is the offender and which is the victim.  But when two children under the age of 13 engage in sexual conduct with each other, each child is both an offender and a victim, and the distinction between those two terms breaks down."  *Id.*

{¶ 38} The state argues that this case is distinguishable from *In re D.B.* because R.C. 2907.02(A)(1)(b) is a strict-liability statute with no mens rea.  R.C. 2907.02(A)(1)(c), on the other hand, provides a way of differentiating the victim from the offender and forces the state to introduce evidence showing that the juvenile who has been charged is, in fact, the offender.  It urges that our decision in *In re B.O.*, 6th Dist. Huron No. H-16-022, 2017-Ohio-43, is instructive here.

14.

{¶ 39} In *In re B.O.*, a 12-year-old child was adjudicated delinquent in connection with his gross sexual imposition of a seven-year-old child under R.C. 2907.05(A)(4). As in In re D.B., the juvenile argued that it was unconstitutional for the state to charge him with gross sexual imposition for nonforcible sexual contact with someone under the age of 13 where he too was under the age of 13. We rejected this argument. We observed that gross sexual imposition under R.C. 2907.05(A)(4) is not a strict-liability offense, and the mens rea element of the offense provides a way to differentiate between the victim and the offender. *We held that* "the victim and the offender in these cases are not treated alike because they are not similarly situated. The mens rea element forces the state to introduce evidence to demonstrate that the juvenile it has charged with the crime of gross sexual imposition was the offender." *Id.* at ¶ 11.

{¶ 40} We reach the same conclusion here. R.C. 2907.02(A)(1)(c) is not a strict-liability statute. A violation occurs where (1) one person's ability to resist or consent to sexual conduct is substantially impaired, (2) the second person is aware of the other's substantial impairment, and (3) the second person engages in sexual conduct with the first person despite this awareness. The statute clearly delineates who is a victim and who is an offender. And as we determined in considering L.S.'s first assignment of error, L.S. was or should have been aware that R.J.'s ability to resist or consent was substantially impaired here.

{¶ 41} We find L.S.'s second assignment of error not well-taken.

15.

## C. Violation of Juv.R. 29 and 35

{¶ 42} On May 9, 2017, L.S. wrote a letter to the juvenile court indicating that he would prefer to serve his DYS commitment rather than fulfill the conditions of his suspended commitment. On May 25, 2017, the state filed a motion to impose the suspended DYS commitment, and on May 30, 2017, the trial court held a hearing on the motion. The court heard testimony from Dean Hall, a counselor from Juvenile Residential Center of Northwest Ohio, and Jay Farris, the chief probation officer for the Ottawa County Juvenile Court. These witnesses provided evidence concerning L.S.'s non-compliance with the conditions of his suspended commitment.

{¶ 43} L.S., through his attorney, indicated that he had no objection to the state's motion to impose the suspended DYS commitment, and in a judgment entry journalized on June 8, 2017, the trial court granted the state's motion. Despite requesting that his suspended commitment be imposed, and despite offering through his attorney that he had no objection to the state's motion, L.S. in his third assignment of error claims that the juvenile court violated his right to due process when it failed to follow Juv.R. 29 and 35 before imposing the suspended commitment.

{¶ 44} As in the preceding assignment of error, the state points out that this issue was not raised in the lower court. It also counters that "the due process requirements which attach to probation revocation proceedings pursuant to Juv.R. 35(D) do not apply to proceedings in which a suspended commitment to DYS is lifted, thereby resulting in the child's commitment." To that end, it seeks to characterize the conditions placed upon

16.

L.S. by the court as something other than probation conditions—it calls them "condition[s] of the stay itself." The state also argues that the imposition of L.S.'s suspended commitment did not arise out of the filing of a complaint or a probation violation, rather it arose from L.S.'s own request that he serve the rest of his sentence in DYS. It disputes that the proceeding was an adjudicatory hearing requiring compliance with Juv.R. 29. And it claims that the outcome of the proceedings would not have been different had the rules been fully complied with.

{¶ 45} Juv.R. 29(B)-(D) applies to adjudicatory hearings and provides as follows:

(B) At the beginning of the hearing, the court shall do all of the following:

(1) Ascertain whether notice requirements have been complied with and, if not, whether the affected parties waive compliance;

(2) Inform the parties of the substance of the complaint, the purpose of the hearing, and possible consequences of the hearing, including the possibility that the cause may be transferred to the appropriate adult court under Juv. R. 30 where the complaint alleges that a child fourteen years of age or over is delinquent by conduct that would constitute a felony if committed by an adult;

(3) Inform unrepresented parties of their right to counsel and determine if those parties are waiving their right to counsel;

(4) Appoint counsel for any unrepresented party under Juv. R. 4(A) who does not waive the right to counsel;

(5) Inform any unrepresented party who waives the right to counsel of the right: to obtain counsel at any stage of the proceedings, to remain silent, to offer evidence, to cross-examine witnesses, and, upon request, to have a record of all proceedings made, at public expense if indigent.

(C) Entry of admission or denial. The court shall request each party against whom allegations are being made in the complaint to admit or deny the allegations. A failure or refusal to admit the allegations shall be deemed a denial, except in cases where the court consents to entry of a plea of no contest.

(D) Initial procedure upon entry of an admission. The court may refuse to accept an admission and shall not accept an admission without addressing the party personally and determining both of the following:

(1) The party is making the admission voluntarily with understanding of the nature of the allegations and the consequences of the admission;

(2) The party understands that by entering an admission the party is waiving the right to challenge the witnesses and evidence against the party, to remain silent, and to introduce evidence at the adjudicatory hearing.

The court may hear testimony, review documents, or make further inquiry, as it considers appropriate, or it may proceed directly to the action required by division (F) of this rule.

{¶ 46} Juv.R. 35(B) provides that "The court shall not revoke probation except after a hearing at which the child shall be present and apprised of the grounds on which revocation is proposed. * * * Probation shall not be revoked except upon a finding that the child has violated a condition of probation of which the child had, pursuant to Juv. R. 34(C), been notified."

{¶ 47} The Ohio Supreme Court held in *In re L.A.B.*, 121 Ohio St.3d 112, 2009-Ohio-354, 902 N.E.2d 471, ¶ 49 that "[s]ince a probation revocation hearing may result in a finding that the juvenile has violated a court order and is delinquent, a probation hearing qualifies as an adjudicatory hearing under the Ohio Rules of Juvenile Procedure." Juv.R. 29, therefore, applies to probation revocation hearings. *Id.* at ¶ 1. "[A] court's failure to substantially comply with Juv.R. 29(D) constitutes plain error." *In re Tabler*, 4th Dist. Lawrence No. 06CA30, 2007-Ohio-411, ¶ 15.

{¶ 48} Here, L.S. claims that the juvenile court (1) failed to inform him of the substance of the state's motion to impose the suspended commitment because it never personally addressed him; (2) failed to ask him if he wanted to enter an admission to the alleged violation—instead defense counsel merely stated "that we would not oppose the motion"; (3) failed to inform him on the record of the consequences of entering an admission; and (4) failed to inform him of the constitutional rights he would be forfeiting

19.

by entering an admission. We have reviewed the record here, and we agree with L.S. that neither the transcript of the May 30, 2017 hearing nor the judgment entry invoking the suspended DYS commitment evidences substantial compliance with Juv.R. 29.[1]

{¶ 49} In addition to Juv.R. 29, due process requires that the juvenile court "comply with the requirements of Juv.R. 35 before it imposes a previously suspended commitment." *In re A.R.D.*, 12th Dist. Butler Nos. CA2008-04-095, CA2008-04-103, 2009-Ohio-1306, ¶ 11. This rule requires the juvenile court to make two distinct findings: (1) that the "child has violated a condition of probation," and (2) that the child had previously been notified of that condition in accordance with Juv.R. 34(C) (mandating that the child "receive a written statement of the conditions of probation" "after the conclusion of the [dispositional] hearing"). *In re T.W.*, 11th Dist. Ashtabula No. 2011-A-0035, 2011-Ohio-6855, ¶ 45. Where a juvenile court fails to comport with these requirements, revocation of the juvenile's probation must be reversed. *Id.* at ¶ 46; *In re A.R.D.* at ¶ 11. Importantly, "[w]e may not presume compliance merely from finding a signed document in the court's file." *Id.* at ¶ 49.

{¶ 50} Having reviewed the record, we conclude that the trial court made the first finding required by Juv.R. 35(B), but did not make the second finding, either orally at the

---

[1] We acknowledge that not all the provisions of Juv.R. 29 will be applicable to a proceeding such as this one. The juvenile court should comply with all procedures that are applicable under the circumstances. *See In re L.A.B.*, 121 Ohio St.3d 112, 2009-Ohio-354, 902 N.E.2d 471, at ¶ 53.

20.

May 30, 2017 hearing or in its June 8, 2017 judgment entry.  We, therefore, agree with L.S. that the juvenile court committed reversible error.

{¶ 51} As a final point, the state argues that the conditions placed upon L.S. were not "probation conditions," thus Juv.R. 29 and 35(B) are inapplicable.  But the juvenile court's judgment entry staying L.S.'s commitment indicates that it ordered L.S. "to follow all terms and provisions of probation," placed L.S. on "intensive probation," and required that he "successfully complete all terms and provisions of said intensive probation."  And in its motion to impose the suspended DYS commitment, the state referred to the conditions in the judgment entry as terms, provisions, and conditions of *probation*.  These conditions were revoked when the court imposed the stayed commitment.

{¶ 52} In *In re J.F.*, 121 Ohio St.3d 76, 2009-Ohio-318, 902 N.E.2d 19, ¶ 9, the Ohio Supreme Court recognized that in January 2002, the General Assembly replaced "probation" in juvenile dispositions with new dispositional options under the heading "community control."  Probation is no longer "a stand-alone disposition," rather, it is "a subcategory or optional element of community control."  *Id.* at ¶ 11.  The language in Juv.R. 35(B) has not been amended, however, to reflect this change, and the terms are often still used interchangeably.  *In re C.H.-M.*, 8th Dist. Cuyahoga No. 103945, 2016-Ohio-4965, ¶ 9, fn. 3.  *Id.*  Thus, whether termed a "probation violation" or merely "a condition of the stay" of a DYS commitment, compliance with Juv.R. 29 and 35 is necessary where a violation has been alleged and imposition of the suspended

21.

commitment is being considered by the court. *See id.* at ¶ 10 (concluding that community control violation hearing requires compliance with Juv.R. 29 and 35).

{¶ 53} Accordingly, we find L.S.'s third assignment of error well-taken, and we reverse the juvenile court's June 1, 2017 judgment. We remand the matter to the juvenile court for a new hearing on the state's motion to impose the suspended DYS commitment.

## D. Ineffective Assistance of Counsel

{¶ 54} In his fourth assignment of error, L.S. claims that trial counsel was ineffective for (1) stipulating to the admission of a BCI laboratory report, (2) failing to object to inadmissible hearsay, and (3) failing to object to the trial court's failure to comply with Juv.R. 29 and 35.

{¶ 55} As to the BCI report, L.S. argues that the report was inherently testimonial, and without defense counsel's stipulation, it would not have been admissible absent authenticating testimony from an expert witness. He claims that because the BCI analyst was not produced as a witness at trial, his confrontation-clause right was violated. He acknowledges, however, that "[a]lternatively, the State would have been required to make [the BCI analyst] available for cross-examination."

{¶ 56} As to "inadmissible hearsay," L.S. complains that the results of the DNA tests were admitted through Detective Carpenter. He also complains that Detective Carpenter testified without objection as to statements made by Carrisales to the effect that Carrisales admitted to having sex with R.J. and that she was too impaired to consent.

22.

And he complains that the SANE nurse was permitted to read R.J.'s "written hospital statement" into the record after R.J. was already dismissed as a witness.

{¶ 57} Finally, L.S. contends that trial counsel was ineffective for failing to object when the juvenile court failed to comply with Juv.R. 29 and 35.

{¶ 58} L.S. argues that all these lapses prejudiced him because this inculpatory evidence would not otherwise have been admitted into the record. L.S. claims that because there was not overwhelming evidence of his delinquency, there is a reasonable probability that the exclusion of this evidence would have affected the outcome of the trial.

{¶ 59} In order to prevail on a claim of ineffective assistance of counsel, an appellant must show that counsel's conduct so undermined the proper functioning of the adversarial process that the trial court cannot be relied on as having produced a just result. *State v. Shuttlesworth*, 104 Ohio App.3d 281, 287, 661 N.E.2d 817 (7th Dist.1995). To establish ineffective assistance of counsel, an appellant must show "(1) deficient performance of counsel, i.e., performance falling below an objective standard of reasonable representation, and (2) prejudice, i.e., a reasonable probability that, but for counsel's errors, the proceeding's result would have been different." *State v. Hale*, 119 Ohio St.3d 118, 2008-Ohio-3426, 892 N.E.2d 864, ¶ 204, citing *Strickland v. Washington*, 466 U.S. 668, 687-88, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *State v. Sanders*, 94 Ohio St.3d 150, 151, 761 N.E.2d 18 (2002).

23.

{¶ 60} Properly licensed Ohio lawyers are presumed competent. *State v. Banks,* 9th Dist. Lorain No. 01CA007958, 2002-Ohio-4858, ¶ 16. To establish ineffective assistance of counsel, the defendant must show that counsel's performance fell below an objective standard of reasonableness and that the deficient performance prejudiced the defendant so as to deprive him of a fair trial. *Strickland* at 688-692.

{¶ 61} As to the stipulated admission of the BCI lab report, it has been recognized that "defense counsel's stipulation to the BCI findings [are] a matter of trial strategy" and ordinarily will not form the basis for an ineffective-assistance claim. *State v. Peterson, 8th Dist. Cuyahoga No. 84583, 2005-Ohio-398, ¶ 12*. Moreover, L.S. has offered no information to suggest that the state would have been unable to produce a witness to authenticate and testify to the lab results had no stipulation been reached. We find that counsel was not ineffective for stipulating to the admission of the report.

{¶ 62} As to Detective Carpenter's testimony about the results of the BCI analysis, this testimony merely reiterated what was contained in the stipulated exhibit. As to Detective Carpenter's testimony conveying Carrisales's admission that he had sex with R.J. and R.J. was too impaired to consent, Carrisales himself testified to these facts. And as to the SANE nurse's testimony in which she was permitted to read R.J.'s "written hospital statement" into the record after R.J. was already dismissed as a witness, the statements R.J. made to the SANE nurse were made for the purpose of diagnosis and treatment, were separate from the statements she made to law enforcement for prosecution purposes, and were, therefore, properly admitted at trial under Evid.R.

24.

803(4).  *See, e.g., State v. Thomas*, 8th Dist. Cuyahoga No. 101202, 2015-Ohio-415, ¶ 24.
Trial counsel was not ineffective for failing to object to the admission of R.J.'s statement
to the SANE nurse.

{¶ 63} Finally, as to trial counsel's failure to object when the juvenile court failed
to comply with Juv.R. 29 and 35, we have already found reversible error in the trial
court's failure to comply with Juv.R. 29 and 35, therefore, any prejudice to L.S. has been
remedied by our resolution of L.S.'s third assignment of error.

{¶ 64} Accordingly, we find L.S.'s fourth assignment of error not well-taken.

### III.  Conclusion

{¶ 65} For purposes of R.C. 2907.02(A)(1)(c), the state presented sufficient
evidence that L.S. knew or should have known that R.J.'s ability to resist or consent to
sexual conduct was substantially impaired, and the court's adjudication of delinquency
was not against the manifest weight of the evidence.  We find L.S.'s first assignment of
error not well-taken.

{¶ 66} R.C. 2907.02(A)(1)(c) is not unconstitutionally vague as applied here.  The
statute makes clear who is a victim and who is an offender.  We find L.S.'s second
assignment of error not well-taken.

{¶ 67} We agree with L.S. that the juvenile court was required to comply with
Juv.R. 29 and 35(B) when it imposed L.S.'s suspended DYS commitment.  We find
L.S.'s third assignment of error well-taken.

25.

**{¶ 68}** Finally, counsel was not ineffective for stipulating to the admission of BCI reports and failing to object to purported hearsay statements. We find L.S.'s fourth assignment of error not well-taken.

**{¶ 69}** We affirm the November 21, 2016 judgment of the Ottawa County Court of Common Pleas, Juvenile Division, but reverse its June 1, 2017 judgment. We remand this matter for a new hearing on the state's motion to impose the suspended DYS commitment. L.S. and the state shall share in the costs of this appeal under App.R. 24.

Judgment affirmed, in part,<br>and reversed, in part.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Thomas J. Osowik, J.            _____

                                             JUDGE

James D. Jensen, J.

                                      _____

Christine E. Mayle, P.J.                          JUDGE
CONCUR.

                                      _____

                                             JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.